UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

STEVEN DANIEL SMOOT,

                        Petitioner,                      Case No. 1:13-cv-244

v.                                           Honorable Paul L. Maloney

JEFFREY WOODS,

                        Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was charged with three counts of third-degree criminal sexual conduct in violation of MICH. COMP. LAWS § 750.520d(1)(b).  On November 19, 2008, a Grand Traverse County Circuit Court jury convicted Petitioner of one count, vaginal/penile penetration, but acquitted Petitioner of the other two counts, fellatio and cunnilingus.  On December 12, 2008, the trial court sentenced Petitioner to 7 to 15 years imprisonment.

In his petition (ECF No. 1) Petitioner raises ten grounds for relief:

I.       Petitioner was denied due process of law when he was convicted based on insufficient evidence.

II.     Due process required dismissal of the conviction due to an inconsistent verdict where the jury acquitted Petitioner of two counts of third-degree criminal sexual conduct, but convicted him of the remaining count of third-degree criminal sexual conduct, even though there was no evidence that the acts were separated or otherwise unrelated to each other.

III.    The court violated Petitioner's due process rights by erroneously denying defense counsel's motion for a mistrial after the prosecutor improperly

elicited testimony from Ms. Bucco that she had been previously sexually assaulted.

IV.     Petitioner was denied his due process right to a fair trial where the court allowed the prosecutor to present improper rebuttal testimony, thereby splitting the proofs to underscore its case in chief.

V.      Petitioner was denied a fair trial by the admission of hearsay statements made by complaining witness Andrea Bucco to her sister Ashley Bucco.

VI.     Petitioner's right to a properly instructed jury was denied when the trial court failed to fully read to the jury the affirmative defense of consent, CJI2d 20.27, in its entirety.

VII.    Petitioner was denied a fair trial because the prosecutor engaged in blatant misconduct by cross-examining him on the irrelevant and prejudicial matter of his employment status, by introducing testimony that he invoked his right to remain silent, and intentionally introducing evidence that the complainant had been sexually assaulted previously.

VIII.   Trial counsel's failure to object to the prosecutor's blatant misconduct amounted to ineffective assistance of counsel.

IX.     Petitioner is entitled to resentencing because the statutory sentencing guidelines were misscored as to Offense Variables 3, 4, and 10, which resulted in a sentence based on inaccurate information.

X.      Petitioner is entitled to resentencing under *Blakely v. Washington*, 542 U.S. 296 (2004) where the court enhanced petitioner's sentence based on facts neither admitted by Petitioner nor proven to a jury beyond reasonable doubt.

(Pet., ECF No. 1, PageID.2-4.)  Respondent has filed a response to the petition (ECF No. 8) and submitted the state-court record (ECF Nos. 9-21) as required under Rule 5, RULES GOVERNING §2254 CASES.  Petitioner has answered the response (ECF No. 22). Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

## Procedural History

### A.    Trial Court Proceedings

Over Petitioner's two day trial the jury learned that Petitioner and the complainant, Ms. Andrea Bucco, engaged in fellatio, cunnilingus, and vaginal intercourse.  Petitioner contended all of the sexual acts were consensual.  Ms. Bucco testified that none of them were.  The verdict suggests that faced with "this classic he-said-she-said, the jury didn't know whom to believe." *Jaradat v. Williams*, 591 F.3d 863, 872 (6th Cir. 2010).

### She said

Ms. Bucco testified that she was introduced to Petitioner through her brother's friend, Al.  (Trial Tr. I, ECF No. 13, p. 125.)[1]  Ms. Bucco spoke with Petitioner twice by phone before they met in person.  (*Id*. at p. 126.)  They conversed about school and Petitioner's child; however, the conversations also took on joking sexual overtones.  (*Id*. at pp. 126-27.)  During the second conversation, on June 3, 2008,  Petitioner and Al informed Ms. Bucco they were coming over to her house.  (*Id*. at p. 127.)

Petitioner, Al, and their friend Joe arrived by car after 5:00 p.m.  (*Id*. at p. 127-29.)  When they arrived, Ms. Bucco was at the end of her driveway, talking on the phone.  (*Id*.)  Ms. Bucco ended her phone conversation.  (*Id*. at p. 129.)  Her sister Ashley and brother Ari joined the

---

[1]The Rule 5 materials submitted by Respondent include several transcripts that shall be referenced herein as follows:

| October 14, 2008 Discovery Hearing | (Discovery Hr'g Tr., ECF No. 11, p. ___) |
|---|---|
| November 14, 2008 Witness Motion Hearing | (Witness Mot.  Hr'g Tr., ECF No. 12, p. ___) |
| November 18, 2008 Trial Transcript  (Volume 1) | (Trial Tr. I, ECF No. 13, p. ___) |
| November 19, 2008 Trial Transcript  (Volume 2) | (Trial Tr. II, ECF No. 14, p. ___) |
| December 12, 2008 Sentencing Transcript | (Sentencing Tr., ECF No. 15, p. ___) |
| July 30, 2009 Hearing on motion to resentence | (Resentence Hr'g Tr. II, ECF No. 16, p. ___). |

group at the end of the driveway.  (*Id*.)  They talked and smoked.  (*Id*.)  Initially they smoked cigarettes, but they also smoked a joint that Petitioner had supplied.  (*Id*. at pp. 129-30.)

As the group conversed, Petitioner invited Ms. Bucco to join him in the car.  (*Id*. at p. 131.)  Ms. Bucco "blew off" the request.  (*Id*.)  Petitioner then asked Ms. Bucco to join him on a walk.  (*Id*.)  With Al's encouragement, Ms. Bucco agreed.  (*Id*.)

The two walked and talked.  (*Id*. at p. 132.)  After they traveled about three tenths of a mile down the road, Petitioner grabbed Ms. Bucco's wrist and pulled her into the woods.  (*Id*. at pp. 132-33.)  Petitioner began to kiss Ms. Bucco on the mouth.  (*Id*. at p. 134.)  She pushed him away and told him to stop.  (*Id*.)  Petitioner grabbed her again, this time by the shoulder, pulled her towards him and again began to kiss her.  (*Id*.)  She again told him to stop.  (*Id*.)  This time, however, Petitioner dropped to his knees, grabbed the back of her legs and pulled her to the ground.  (*Id*. at p. 135.)  Petitioner groped her breasts and removed Ms. Bucco's skirt.  (*Id*. at pp. 135-36.)  He began licking her vaginal area.  (*Id*. at p. 136.)

Ms. Bucco tried to scoot away, but Petitioner pulled her back.  (*Id*.)  He pulled her to a sitting position, grabbed her head, and forced her mouth over his exposed penis.  (*Id*. at p. 137.)  Ms. Bucco gagged, so Petitioner released her head.  (*Id*. at p. 138.)  He then pushed her back on the ground and inserted his penis in her vagina.  (*Id*.)  At that point, Ms. Bucco just lay there, she did not try to get up or escape.  (*Id*.)

When Petitioner was finished, he got up and got dressed.  (*Id*. at p. 139.)  Ms. Bucco got dressed as well.  (*Id*.)  He offered her a cigarette and they walked back to the house–in complete silence.  (*Id*. at pp. 139-41.)

As soon as she got back to the group at the end of the driveway, Ms. Bucco grabbed the phone and spoke with her friend Megan.  (*Id*. at p. 142.)  Megan convinced Ms. Bucco to take action.  (*Id*. at p. 143.)  Ms. Bucco told her mother and her parents called the police.  (*Id*.)

### He said

Petitioner also recalled two phone conversations with Ms. Bucco.  (Trial Tr. II, ECF No. 14, pp. 3-1-03.)  Petitioner recalled that the initial call was about 30 minutes long and included Ms. Bucco saying she was horny and inquiring as to Petitioner's penis size.  (*Id*. at p. 302.)  The second call involved more mundane topics, but Petitioner interpreted one of Ms. Bucco's comments as inviting Petitioner and Al to have sex with her simultaneously.  (*Id*. at p. 303.)  When Petitioner arrived at Ms. Bucco's house on June 3, he thought that she was interested in him.  (*Id*. at p. 305.)

Petitioner's recollection matched that of Ms. Bucco with respect to the persons participating in the end-of-driveway conversations and their activities there.  (*Id*. at p. 308.)  He remembered asking Ms. Bucco to come into the car with him; but, Petitioner recalls her declining the invitation rather than simply ignoring it.  (*Id*.)

Petitioner recalled that the two held hands as they walked down the road.  (*Id*. at p. 310.)  Their conversation was again mundane until Ms. Bucco informed Petitioner that she was not wearing panties.  (*Id*. at pp. 310-11.)  Petitioner took that statement as an indication that Ms. Bucco wanted to have sex with him.  (*Id*.)

Once they had advanced beyond a curve in the road, Ms. Bucco guided Petitioner by the hand through a field and into the woods.  (*Id*. at pp. 311-14.)  They kissed for a time.  (*Id*. at 314-17.)   Ms. Bucco did not resist or protest.  (*Id*. at pp. 316-17.)  She did not say "no."  (*Id*.)

- 5 -

According to Petitioner, Ms. Bucco pulled down his pants and began to play with his penis.  (*Id*. at p. 317.)  They removed their sweatshirts and laid them on the ground.  (*Id*. at pp. 317-18.)  Ms Bucco lay down willingly.  (*Id*. at p. 319.)  At that point Petitioner, as he always does before having sex, asked her if she wanted to have sex.  (*Id*.)  She said "yes," spread her legs, and Petitioner began performing oral sex on her.  (*Id*.)  She then got up and performed oral sex on Petitioner.  (*Id*. at p. 320.)  After that she laid back down, again spread her legs, and they had vaginal intercourse. (*Id*.)  Petitioner did not ejaculate.  (*Id*. at pp. 321-22.)  After they stopped, they dressed and walked back, both smoking cigarettes.  (*Id*. at p. 323.)

Petitioner was adamant that he did not force himself on Ms. Bucco or threaten her. She never resisted and she never said no.  Instead she was cooperative throughout and responded affirmatively when asked if she wanted to have sex.

### The verdict

With that testimony as the backdrop, it is certainly difficult to discern how the jury parsed the competing stories such that Petitioner was not guilty on two counts but guilty on the third.

### The sentence

Petitioner's counsel challenged the scoring of a couple of the guidelines offense variables at sentencing.  The court agreed with Petitioner's counsel on both challenges.  The minimum range was 84 months to 140 months.  The court sentenced Petitioner at the very bottom of the range.

### B.    Direct Appeal

Petitioner filed a claim of appeal in the Michigan Court of Appeals.  His initial brief, filed by counsel, and supplemental brief, filed in pro per, raised essentially the same issues that he

raises in his habeas petition.  The court of appeals rejected each of Petitioner's claims of error and affirmed the trial court by unpublished opinion dated June 1, 2010.  (Mich. Ct. of App. Op., ECF No. 19.)

Petitioner filed an application for leave to appeal in the Michigan Supreme Court. The application presents the same issues presented in his habeas petition.  That court denied leave initially by order entered October 5, 2011, and upon reconsideration by order entered March 9, 2012. (Mich. Orders., ECF No. 20.)

Petitioner commenced this action with the filing of his petition on March 4, 2013.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A. Insufficient evidence

Petitioner argues that there was insufficient evidence that he forcibly penetrated Ms. Bucco. A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier of fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier of fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (*en banc*) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency of the evidence grounds.  *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

To convict Petitioner of third-degree criminal sexual conduct "the [prosecutor] had to show that [Petitioner] used force or coercion when he sexually penetrated the complainant." (Mich. Ct. of App. Op., ECF No. 19, p. 1.)  Petitioner admitted the sexual penetration, so the only issue for the jury was whether Petitioner used force.  Petitioner focuses exclusively on that element in his sufficiency argument.  That argument, however, reveals that this case is particularly ill-suited for a sufficiency challenge because it turns completely on assessing Petitioner's and Ms. Bucco's credibility.  (Petition, ECF No. 1, PageID.30 ("This criminal sexual conduct case was essentially a typical one-on-one credibility contest between the complainant and Petitioner.").)

The Michigan Court of Appeals rejected Petitioner's sufficiency challenge:

Defendant argues that because there was a lack of testimony that he actually used force to overpower the complainant, there was insufficient evidence to support his conviction.  We find that defendant is mistaken, based on our reading of our Supreme Court's decision in *People v. Carlson*, 644 NW2d 704 (2002).  In that case, the Supreme Court explained that the force used:

> must be force to allow the accomplishment of sexual penetration when absent that force the penetration would not have occurred.  In other words, the requisite "force" for a violation of MCL 750.520d(1)(b) does not encompass nonviolent physical interaction in a mechanical sense that is merely incidental to an act of sexual penetration.  Rather, the prohibited "force" encompasses the use of force against a victim to either induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment of sexual penetration without regard to the victim's wishes. [*Carlson*, 644 NW2d at 709.]

> In the present case, the complainant testified that defendant pushed her to the ground and put his penis inside her vagina.  The complainant testified that she did not want to have sex with defendant and that she pushed him away and told him to stop when he first pulled her into the woods and began kissing her.  Also, when defendant performed cunnilingus on her, she told him to stop at least three times and tried to scoot away from him.  Although the complainant did not say no to defendant when he pushed her to the ground to have sexual intercourse, she testified that she did not say anything to him or fight him because she was scared.  Based on this testimony and our reading of *Carlson*, there was sufficient evidence to find that defendant used force to facilitate the accomplishment of sexual penetration without regard to the complainant's wishes.

(Mich. Ct. of Appeals Op., ECF No. 19, pp. 2-3 (parallel citations omitted).)  The state court's determinations were consistent with clearly established federal law and reasonable on this record.  Examined in a light most favorable to the prosecution, the evidence before the jury supports a finding that Petitioner used force to sexually penetrate Ms. Bucco.  His sufficiency challenge is without merit.

### B.  Inconsistent verdict

Whether or not the evidence is sufficient to sustain his conviction on the penile-vaginal third-degree criminal sexual conduct count, Petitioner contends that his conviction on that count violates his due process rights because it is hopelessly inconsistent with his acquittal on the other two counts.  The Michigan Court of Appeals rejected Petitioner's argument noting that  under well established Michigan law, consistent verdicts are not required. *See People v. Vaughn*, 295

N.W.2d 354 (Mich.1980).  The court of appeals observed, however, that the verdicts here were not inconsistent:

> The complainant testified that all three sexual penetrations were not consensual and that she told defendant no when he tried to perform cunnilingus on her and right before he vaginally penetrated her.  In contrast, defendant asserted that the complainant consented to all three sexual acts.  If there is an interpretation of the evidence that logically explains the jury's findings, the verdict is not inconsistent. [*People v.*] *Tombs*, [697 NW2d 494, 503 (Mich. 2005)].  The jury apparently believed that the complainant consented to the cunnilingus and fellatio, but not the vaginal penetration.  The jury's acceptance of and rejection of certain components of defendant's testimony and the complainant's testimony in this case logically explains the jury's verdict.  Thus, the verdict is not inconsistent.

(Mich. Ct. of App. Op., ECF No. 19, p. 4 (parallel citation omitted).)

While the Michigan Court of Appeals relied upon Michigan law in reaching its determination, the legal standard it applied is consistent with the holdings of the United States Supreme Court on this issue. The Supreme Court has long held that inconsistency in a verdict is not a sufficient basis for habeas corpus relief. *Harris v. Rivera*, 454 U.S. 339, 345 (1981). The Court squarely has held that "a criminal defendant convicted by a jury on one count [may] not attack that conviction because it [i]s inconsistent with the jury's verdict of acquittal on another count." *United States v. Powell*, 469 U.S. 57, 58 (1984) (inconsistent verdicts provide no basis for reversal; conviction for compound crime upheld where defendant was acquitted of predicate crime) (citing *Dunn v. United States*, 284 U.S. 390 (1932)). *See also Patterson v.* Caruso, 219 F. App'x 451, 454-55(6th Cir. 2007); *United States v. Smith*, 182 F.3d 452, 457 (6th Cir. 1999); *Mapes v. Coyle*, 171 F.3d 408, 419–20 (6th Cir. 1999); *United States v. Patrick*, 965 F.2d 1390, 1396 (6th Cir. 1992) (inconsistent jury verdicts may not form the basis for setting aside proper convictions on other counts); *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990); *United States v. Martin*, 897

F.2d 1368, 1373 (6th Cir. 1990). "[W]here truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Powell*, 469 U.S. at 64-65 (quoting *Dunn*, 284 U.S. at 393.)

To be entitled to habeas corpus relief, a petitioner must show that the right he seeks to vindicate is clearly established by holdings of the United States Supreme Court. *See Williams*, 529 U.S. at 412. The Supreme Court has never held that a state criminal guilty verdict is unconstitutional because it conflicts with inconsistent verdicts of acquittal on other charges. In fact, the law is completely to the contrary. *See Powell*, 469 U.S. at 58. The Michigan Court of Appeals' conclusion that the verdicts caused no constitutional infirmity was, therefore, fully consistent with controlling United States Supreme Court precedent. Petitioner's challenge to his convictions based on inconsistent verdicts is without merit.

## C.      Improper admission of evidence

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as

fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

For an issue regarding the admission of evidence, the Sixth Circuit has applied the following standard in cases under the AEDPA:

> Habeas petitioners are not entitled to relief unless an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A petitioner will prevail where "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law" substantially affected a jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). However, we will grant federal habeas corpus relief only where a violation of a state's evidentiary rule results in the denial of fundamental fairness, and therefore, a violation of due process. *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988). "'The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is 'material in the sense of a crucial, critical highly significant factor.'" *Leverett v. Spears*, 877 F2d 921, 925 (11th Cir. 1989) (quoting *Redman v. Dugger*, 866 F.2d 387, 390 (11th Cir. 1989)). Even assuming the state court erred in permitting Dr. Shaler's testimony, this court will grant federal habeas relief only where the error rises to the level of a denial of fundamental fairness. *See Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993).

*Brown v. O'Dea*, 187 F.3d 572, 578 (6th Cir. 1999). Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner identifies three instances where testimony was permitted where it should not have been as a result of court error, prosecutorial misconduct, and/or ineffective assistance of defense counsel.

> **1.    The court denied Petitioner due process by permitting the trial to go forward following prosecutorial misconduct that elicited testimony from the victim regarding a prior sexual assault.**

The Michigan Court of Appeals analyzed this issue as follows:

In the present case, before the start of trial and opening arguments, the trial court informed the assistant prosecutor, that prior to eliciting any testimony, that the complainant's brother had previously sexually assaulted her, the assistant prosecutor had to raise the issue outside the presence of the jury.  The assistant prosecutor informed the trial court that the issue would not be raised in opening argument, but that the complainant would testify about the matter during direct examination.  The assistant prosecutor argued that the incident was relevant to rebut defendant's theory that the complainant did not behave as a person who had been sexually assaulted because such testimony would help the jury to understand why the complainant did not fight defendant.  Defendant argued that the testimony was irrelevant, highly prejudicial, and inadmissible pursuant to the rape shield statute, MCL 750.520j.  The trial court expressed reluctance to rule on the issue at that time because the prosecutor had not filed a trial brief and, accordingly, it was not prepared to make a ruling.  However, on redirect examination, the assistant prosecutor asked the complainant why she did not fight, scratch, or bite defendant when he tried to have sex with her, to which the complainant replied, "Because this has happened before."  Defendant objected and the jury was excused.  The trial court then appropriately admonished the assistant prosecutor for disobeying its previous order by not giving the trial court an opportunity to make a ruling on the admissibility of the testimony.  Before denying defendant's motion, the trial court stated that it did not believe the testimony had prejudiced defendant's case because it did not believe the jury would convict defendant for something that the complainant's brother had done to her.  Nonetheless, the court believed that a cautionary instruction was appropriate and would cure any prejudice arising from the assistant prosecutor's error; hence, the jury was recalled and the trial court gave the following curative instruction:

> Okay, members of the jury, when we broke, there was some single answer about something about it happened once before.  I'm striking that answer, because it's completely irrelevant.

> It turns out that what was being referred to had nothing to do with this Defendant, nothing to do with this incident. Indeed, it is separated from this incident by a period of years. So it is completely irrelevant to what did or did not happen here.
>
> A trial court should grant a mistrial only where the prejudicial effect of an error cannot be cured any other way. *People v. Bauder*, 712 NW2d 506 (2005). The purpose in objecting to a prosecutor's improper conduct at trial is to seek a curative instruction. *People v. Cross*, 508 NW2d 144 (1993). Curative instructions are deemed to cure most errors. *People v. Chapo*, 770 NW2d 68 (2009). Jurors are presumed to follow their instructions. *People v. Abraham*, 662 NW2d 836 (2003), citing *People v. Graves*, 581 NW2d 229 (1998).

(Mich. Ct. of App. Op., ECF No. 19, p. 5 (parallel citations omitted).) Neither the trial court nor the court of appeals ever ruled whether evidence regarding the prior sexual abuse was admissible. (Mich. Ct. of App. Op., ECF No. 19, p. 6 n.2; Trial Tr. I, ECF No. 13, pp. 196-222.) Instead, the prosecutor simply abandoned that line of questioning and argument. (*Id*. at p. 218.) The only question is whether the one question and answer followed by the curative instruction rendered the trial fundamentally unfair. The Michigan Court of Appeals concluded Petitioner had failed to demonstrate the requisite unfairness: "Defendant does not demonstrate that the instruction given by the trial court failed to cure any defect arising as a result of the assistant prosecutor's improper questioning or that the jury failed to follow the trial court's curative instruction." (Mich. Ct. of App. Op., ECF No. 19, p. 6.)

In his argument to this Court, Petitioner does little more than offer the conclusory statement that Ms. Bucco's five words irreparably prejudiced him. He supports that conclusion with the words of the United States Supreme Court from *Krulewitch v. United States*, 336 U.S. 440 (1948): "The naive assumption that prejudicial effects can by overcome by instructions to the jury,

[citation omitted] all practicing lawyers know to be an unmitigated fiction." *Id.* at 453.[2]   These words have been used when identifying categories of evidence that are so prejudicial that they are incurable by instruction.  *See, i.e., Bruton v. United States*, 391 U.S. 123 (1968) (confession of co-defendant at joint trial); *Marshall v. Lonberger*, 459 U.S. 422 (1983) (aggravating prior convictions to permit sentence of death in single phase trial); *Stewart v. Cowan*, 528 F 2d 79 (6th Cir. 1976) (anonymous phone calls to police identifying the defendant as the perpetrator). None of those categories, however, are similar to the evidence at issue here.

Petitioner has failed to demonstrate that the Michigan courts' conclusions on this issue are inconsistent with clearly established federal law or premised on an unreasonable determination of fact.  His habeas challenge is, therefore, without merit.

### 2.      The victim's brother's rebuttal testimony

Petitioner next claims that his trial was tainted by the admission of the testimony of Ms. Bucco's brother.  That testimony was offered by the prosecutor in rebuttal after the close of Petitioner's proofs.  It consisted of the following exchange:

Q:      Ari, after the Defendant, Al Stevens and Joe Farnsworth left that night, did you talk again to the Defendant?

A:      Yes, I did.

Q:      That was on the phone?

A:      Yup.

Q:      And what did the Defendant tell you?

---

[2]It must be noted that this oft-quoted statement from *Krulewitch* is not "clearly established federal law."  It appears in the concurring opinion of Justice Jackson.  He was joined by only two other justices.

A:      He basically told me that he gave my sister oral, she did the same to him and
        then he fucked her.

Q:      Were those his words?

A:      Yes.

Q:      I'm sorry can you–

A:      They had sex after giving each other oral.

(Trial Tr. II, ECF No. 14, pp. 355-56.)[3]  The testimony was offered to impeach Petitioner who had

testified that he did not speak to the witness by phone after the incident.  (*See* Trial Tr. II, ECF No.

14, pp. 335, 340-41.)

        Petitioner's counsel objected to the testimony because the prosecutor had previously

represented specifically that members of Ms. Bucco's family would not be called in rebuttal, the

testimony could have been introduced in the prosecutor's case-in-chief, and, following the witness's

testimony during the case-in-chief, the witness had not been sequestered.  Certainly the fact that Ms.

Bucco's brother testified was not a surprise to Petitioner, he had been identified as a witness and had

testified in the prosecutor's case-in-chief.  Nor was the content of his testimony a surprise; it

appeared in a statement he completed the night of the incident.  (Trial Tr. II, ECF No. 14, p. 349.)

The challenge is premised upon the fact that Ms. Bucco's brother was not sequestered, the fact that

the prosecutor had specifically represented the witness would not be called in rebuttal, and on the

timing of the prosecutor's presentation of the evidence.

        The Michigan Court of Appeals resolved the issue as follows:

---

        [3]Petitioner's counsel then asked three questions confirming that Petitioner had informed the witness the sex was
consensual.  (Trial Tr. II, ECF No. 14, pp. 356-57.)  The trial judge then posed questions presented to him by the jury.
(*Id*. at pp. 357-58.)

Defendant does not deny that the complainant's brother's testimony was proper rebuttal evidence. Rather, his argument rests on the mistaken assumption that because of the prosecutor's representations, the trial court could not properly allow the rebuttal testimony without violating defendant's due process rights. First, defendant cites no authority compelling this Court to conclude that the trial court's ruling was improper. Second, because a criminal trial is not scripted play, a trial court must have broad power to address situations that might arise in the adversary process. MCL 768.29; *People v. Figgures*, 547 NW2d 673 (1996), relying on *Geders v. United States*, 425 U.S. 80, 86 (1976). Because the brother's testimony was proper rebuttal evidence, *People v. Natella*, 544 NW2d 667 (1996), it cannot be said that the trial court's decision was an abuse of discretion.

Even if we were to concur with defendant that the actions of the assistant prosecutor constituted error, defendant is not entitled to relief on this issue because he has not established the requisite prejudice. [*People v.*] *Wells*, [605 NW2d 374 (1999)]. It is undisputed that defendant and the complainant engaged in three sexual acts that were the subject of defendant's trial. We conclude the brother's rebuttal testimony that defendant told him that defendant and the complainant had consensual sex bolsters rather than rebuts defendant's defense. Thus, even if improperly admitted, defendant was not prejudiced by the brother's testimony because the rebuttal testimony merely bolstered defendant's defense. Therefore, defendant is not entitled to relief on this issue.

(Mich. Ct. of App. Op., ECF No. 19, p. 7 (parallel citations and footnote omitted).)

The court of appeals makes glancing reference to due process. That mirrors Petitioner's argument. Although he twice uses the words "due process," there is no mention of due process in the authorities he cites. Those authorities rely on state law alone. Of course, the federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Moreover, federal courts have concluded that there is no constitutional right to sequestration of witnesses:

A refusal to exclude ("separate") witnesses until they testify is not a denial of due process. Separation or sequestration of witnesses, on which see *Geders v. United*

> *States*, 425 U.S. 80, 87 (1976); Fed. R. Evid. 615, is a long-established and
> well-recognized measure designed to increase the likelihood that testimony will be
> candid. But the due process clause does not incorporate every refinement of legal
> procedure designed to make trials fairer or more accurate - not even one hallowed by
> time. *See, e.g., Watson v. Camp*, 848 F.2d 89 (7th Cir.1988).

*Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988); *see also Mathis v. Wainwright*, 351 F.2d 489

(5th Cir. 1965). Similarly, there is no constitutional right to the presentation of proofs in any

particular order. *Geders v. United States*, 425 U.S. 80, 86 (1976) ("The trial judge must meet

situations as they arise and to do this must have broad power to cope with the complexities and

contingencies inherent in the adversary process. To this end, he may determine generally the order

in which parties will adduce proof . . . .").[4]  In short, Petitioner has failed to demonstrate that the

Michigan court's determination regarding the admission of the rebuttal testimony was inconsistent

with or contrary to clearly established federal law.  Thus, his habeas challenge regarding that

testimony is without merit.

### 3.     Hearsay

Petitioner next complains that the court permitted Ms. Ashley Bucco, the victims's

sister, to testify regarding statements the victim made to her approximately ten minutes after

returning from her walk with Petitioner.  That testimony came in as follows:

> Q:     When you got back downstaris, this would be about ten minutes now after
>        she had come back from the walk, how did she appear to you?
>
> A:     When I was downstairs, she was crying her eyes out.  Talking on the phone
>        with Sam.
>
> Q:     Okay.  And when you say, "crying her eyes out '--

---

[4]Although the *Geders* Court was specifically referencing the broad power of federal judges in federal criminal
cases, the federal courts have not hesitated to apply the case in the habeas context. *See, i.e, Harris v. Barkley*, 202 F.3d
169, 173 (2d Cir. 2000); *Loher v. Thomas*, 825 F.3d 1103 (9th Cir. 2016).

A:      She could barely utter any words.  She just kept crying and saying, I told him no.  And that's all she could say.

[Petitioner's counsel objected to the testimony as hearsay and argument followed. The court permitted the testimony as an excited utterance.]

Q:      Did she tell you why she was so upset?

A.      No.  She just kept saying she was–she was sorry and that she said no.  And then she showed me the mark.  I'm like Andy, did he rape you?  And she just cried harder and shook her head yes.  And I took the phone from her.

Q:      When you say, "she showed you a mark"--

A:      There was a scar on the back, on the lower back, and it was really red.

Q:      And did she say anything about who or how she got it?

A:      She said that he had pulled her legs out from under her and she fell on a stick.

[Petitioner's counsel renewed his objection; the court overruled the objection.]

Q:      Was she able to tell you anything beyond that?

A:      Not until after I hung up the phone on Sam and I got her to calm down a little.

(Trial Tr. II, ECF No. 14, pp. 275-77.)   Petitioner contends the exchange violated his Sixth Amendment right to confront the witnesses against him.

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI.  The Supreme Court has long read this right as securing an adequate opportunity to cross-examine adverse witnesses.  *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)).  As stated by the Court:

Our own decisions seem to have recognized at an early date that it is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause:

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.

*California v. Green*, 399 U.S. 149, 157-58 (1970).

In *Green*, the Court compared the purposes of confrontation with the dangers in admitting an out-of-court statement. Confrontation "(1) insures that the witness will give his statements under oath – thus impressing the witness with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for discovery of truth'; and (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green*, 399 U.S. at 158. Although an out-of-court statement may not have been subject to any of these protections, it regains the lost protections if the declarant is present and testifying at trial. *Id.* at 158. Further, an inability to cross-examine the witness at the time the out-of-court statement is made is not of crucial significance as long as the witness is subject to full and effective cross-examination at trial. *Id.* at 159. Similarly,

the jury's inability to view the declarant's demeanor when the statement was made is not important when the jury may view that witness at trial either affirming or disavowing the statement. *Id.* at 160. In other words, contemporaneous cross-examination before the jury is not so much more effective than subsequent examination at trial that it must be made the touchstone of the Confrontation Clause. *Id.* at 161. Thus, where the declarant testifies and is cross-examined, "our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." *Green*, 399 U.S. at 162; *see also Owens*, 484 U.S. at 560 (inquiry into the "indicia of reliability" or the "particularized guarantees of trustworthiness" of the out-of-court statements is not called for when the declarant is available at trial and subjected to unrestricted cross-examination, because "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements").

The declarant, Andrea Bucco, testified at trial and Petitioner's counsel subjected her to unrestricted cross-examination. Petitioner's Confrontation Clause argument has no merit.

### D.    Prosecutorial misconduct

Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny petitioner a fundamentally fair trial. *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir.1993). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel*

*v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc). "When a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra*, 4 F.3d at 1355 (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

Petitioner argues that he was prejudiced by the prosecutor's misconduct in questioning him regarding his employment status and then inviting the jury to consider that information in assessing his guilt. Petitioner argues further that the prosecutor improperly commented on Petitioner's exercise of his right to remain silent.[5]

---

[5] Petitioner also contends that the prosecutor's elicitation of the victim's statement regarding prior sexual assault and use of the victim's brother's testimony in rebuttal fall into the category of prosecutorial misconduct. For the reasons stated above, however, these issues do not rise to the level of a constitutional violation.

- 24 -

1.      **Testimony and argument regarding Petitioner's employment status**

Petitioner complains that the prosecutor elicited inadmissible testimony regarding

Petitioner's employment and income:

Q:      Mr. Smoot, back in June, you were living at the Good Will Inn; is that right?

A:      Yes.

Q:      Did you have a job?

A:      I was working at Labor Ready and I applied at Applebee's .  And I was in the process of possibly working there at Applebee's, too.

Q:      Okay.  But you didn't have a consistent job back in June?

A:      I didn't have a consistent job, because I just moved up here and I was having a hard time finding a job.

Q:      So you're living at the Good Will Inn, did you have a car?

A:      No.

Q:      Any source of income at all?

A:      No, I did not. Only from Labor Ready.  They pay you every day.

Trial Tr. II, ECF No. 14, p. 325.)[6]

_____

[6]Prior to Petitioner's testimony, the court had posed similar questions to the victim:
Q:      Did you have a job at the time that this incident occurred?
A:      I had a job but I had quit, and then my boss brought me back in.
Q:      Did he bring you back in before this incident or afterwards?
A:      It was after.
Q:      And how long afterwards before you were called back to your job?
A:      A few days.
Q:      And did you go back to work there?
A:      Yes.
Q:      And where was that?
A:      McDonalds.
Q:      Okay.  And how many hours were you working when you were called back?
A:      Eighteen hours a week.
Q:      Okay.  And let's see–did you continue working during that summer then?

The prosecutor then referenced that evidence in her closing arguments:

Now the Defendant would have you believe that 16-year-old Andy Bucco was the one who was interested in him. He's a 28-year-old stranger, she's talked to him on the phone twice. We're not talking about a guy who's a senior, a guy who's 18, 19, 20. Somebody's who has a job and spending money on her, you know, an older guy. We're talk about a 16-year-old and a sophomore in high school and a 28-year-old.

Do you remember when you were 16 and how old 30 seemed? That's a big difference. And he wants you to believe that she's the one that was that interested, that followed him.

The Defendant, too, is living at the Good Will Inn. He has no car. He has no income. No source of income at all. He's not going to the bar to pick up women, and so he finds–he finds Andrea Bucco.

(Trial Tr. II, ECF No. 14, pp. 365-66.) There is little question that this evidence bore no relevance to whether Petitioner was guilty of third-degree criminal sexual conduct. Relying on *People v. Johnson*, 227 N.W. 2d 523 (1975), the court of appeals concluded it was "unfounded character assassination" and "highly improper." (Mich. Ct. of App. Op., ECF No. 19, pp. 10-11) Nonetheless, the court of appeals also determined that the references were "fleeting" and did not affect the outcome of the trial. (*Id.* at p. 11.)[7]

---

A:      Yes.
Q:      Okay. And do you currently work at this time?
A:      No.
(Trial Tr. I, ECF No. 13, pp. 193-94.)

[7]The vast majority of the dozens of Michigan appellate court opinions applying *Johnson* have reached the same conclusion: the prosecutor's references to Petitioner's financial situation were not so prejudicial as to require reversal. *See, e.g., People v. Williams*, No. 296128, 2011 WL 1565184 (Mich. Ct. App. Apr. 26, 2011) (questions regarding employment status, though improper, did not affect the outcome of the trial); *People v. Harris*, No. 265230, 2007 WL 1202332 (Mich. Ct. App. Apr. 24, 2007) (prosecutor's improper questions regarding employment status were not outcome determinative); *People v. Jennings*, No. 240349, 2003 WL 22161824 (Mich. Ct. App. Sept. 18, 2003) (court determined that improper questions regarding defendant's financial situation were harmless); *People v. Erlich*, No. 209179, 2000 WL 33529635 (Mich. Ct. App. Mar. 3, 2000) (defendant not prejudiced by questions regarding his employment status); *People v. Nelson*, 273 N.W. 2d 512 (Mich. Ct. App. 1978) (prosecutor's reference to the defendant's impecuniousness was harmless error); *People v. Thomas*, 276 N.W. 2d 548 (Mich. Ct. App. 1978) (reversal not required where prosecutor established that defendant was unemployed at the time the crimes occurred). In only four particularly egregious cases have the Michigan appellate courts applied *Johnson* and reversed a conviction. *People v. Hammond*,

- 26 -

Petitioner does not identify any clearly established federal law holding that prosecutorial references to a defendant's financial circumstance are *per se* prejudicial.[8]  The court of appeals' determination that no prejudice accrued to Petitioner is not unreasonable and is not inconsistent with Supreme Court precedent.  Accordingly, Petitioner's habeas claim is without merit.

### 2.    Testimony regarding Petitioner's post-arrest silence

Petitioner next complains that the prosecutor elicited testimony from Deputy Mark DePew that drew attention to the fact that Petitioner had requested a lawyer, putting an end to Deputy DePew's interview of Petitioner.  Petitioner argues that such conduct effectively uses his silence against him in violation of the Fifth Amendment.

Deputy DePew testified as follows:

Q:    And did the Defendant make any statements to you during transport or anything?

A:    When we were in the initial interview he did not.  He wanted a lawyer, so at that point, everything stopped.  At that point, he was placed under arrest.

When we were taking him to the car, he made statements such as, it was consensual.  She told me that – she told me that she was 19.  And at that point, I said, look, you want to invoke your right to remain silent, I don't want to talk to you.  When we got to the jail, he then said those same statements again.

---

232 N.W.2d 174 (Mich. 1975) (armed robbery conviction reversed where prosecutor elicited testimony that defendant's wife was on welfare, defendant did not have regular employment, was often absent overnight, yet had a car and a cashmere coat and prosecutor argued that defendant was lazy and desperately needed money); *People v. Ashworth*, No. 251881, 2005 WL 1048483 (Mich. Ct. App. May 5, 2005) (questions regarding employment status and defendant's "need for money" during closing combined with defense counsel's own introduction of the subject at trial rendered trial unfair and unreliable); *People v. Andrews*, 276 N.W.2d 867 (Mich. Ct. App. 1979) (reversal required where prosecutor improperly elicited testimony regarding defendant's unemployment as evidence of motive for robbery); *People v. Leverette*, 269 N.W.2d 559 (Mich. Ct. App. 1978) (prosecutor's invitation to jury to infer from defendant's unemployment and access to money that the money must have come from criminal activities required reversal).

[8]Even the Michigan courts acknowledge that *Johnson* did not create a *per se* rule.  *People v. Henderson*, 289 N.W.2d 376, 379 (Mich. 1980).

Trial Tr. I, ECF No. 13, p. 227.)  Although Deputy DePew referenced Petitioner's request for an attorney and his invocation of the right to remain silent, the prosecutor did not ask for that information.  Rather, apparently with the knowledge that Petitioner had made statements during transport, the prosecutor asked if Petitioner had made statements during transport.  Petitioner offers no basis for his conclusion that it was the prosecutor's intention that Deputy DePew offer testimony that was not responsive to the question she posed.

The prosecutor never referenced Petitioner's exercise of his rights during her questioning of witnesses or her argument.  The same cannot be said for Petitioner's counsel.  In closing Petitioner's counsel stated:

> We do know that when the police ultimately go to Steve's house that same night he's cooperative.  Asks for his clothes, he lets them have his clothes.  They tell him his rights, he says, I don't know if I should talk to you.  I want to talk to a lawyer.  And then we do know he did make some voluntary statements thereafter that I think DePew told us, you know, that he had been out there, thought she was 19 and had consensual sex with her.

(Trial Tr. II, ECF No. 14, p. 395.)  Where the prosecutor's question did not invite comment on the Petitioner's exercise of his right to remain silent and the prosecutor never mentioned Petitioner's exercise of that right, it seems anomalous to suggest that this is an issue of prosecutorial misconduct.

The Michigan Court of Appeals did not even address Petitioner's assertion of error with regard to Deputy DePew's testimony.  It simply acknowledged that Petitioner had presented the issue and declared it to be meritless.   (Mich. Ct. of App. Op., ECF No. 19, p. 10.)

Petitioner's right to remain silent and the protections afforded his exercise of that right have their genesis in the Fifth Amendment.  The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against

himself."  In order to prevent coercive custodial interrogations designed to undermine the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel.  *Id.* at 478-79.  Under *Miranda*, evidence of a defendant's custodial statement may only be introduced as evidence of guilt at trial if the defendant was first given such warnings.  *Id.* at 479.

In *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial.  The Court held "that the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings."  *Id.* at 618.  On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial.  *Id.*

Even if Deputy DePew's brief comment or Petitioner's counsel's reference to Petitioner's invocation of his Miranda rights constitute a *Doyle* violation, the violation was harmless. Trial references to a defendant's exercise of his right to remain silent are not a structural error requiring automatic reversal.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a

"substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. The record here provides no support for the conclusion that the passing references to Petitioner's very brief period of silence had a substantial and injurious effect or influence on the jury's verdict. The trial testimony disclosed that Petitioner had never really remained silent. He consistently offered the same account with respect to the events of June 3: he had consensual sex with Ms. Bucco. Petitioner was never portrayed as anything but cooperative with the police. Under those circumstance, it simply cannot be said that the brief reference to the few moments where he exercised his right to say nothing had a substantial and injurious effect on the jury's verdict. The Michigan Court of Appeals reasonably concluded that Petitioner's *Doyle* challenge is without merit.

### E.   Jury instruction on consent

Petitioner complains that he was denied due process when the trial court failed to read Michigan Criminal Jury Instruction (CJI) 2d 20.27, regarding consent, in its entirety. The Michigan Court of Appeals concluded that, as a matter of state law, the trial court was not required to use the CJI at all, noting that the CJI did not have the sanction of the Michigan Supreme Court. (Mich. Ct. of Appelas Op., ECF No. 19, p. 9) The court of appeals stated "the trial court's instructions to the jury, as a whole, fairly presented the issues to be tried and the substance of defendant's consent defense . . . ." (*Id.*)

The Michigan Court of Appeals opinion included CJI 2d 20.27 in its entirety. Comparing the standard instruction to the instruction offered by the trial court reveals only one missing element. The instruction invites the jury to consider certain questions that might be helpful in determining whether the victim consented to the act. The trial court did not read one of the

questions: "Did the defendant display a weapon?" (*Id.*)  As the court of appeals recognized, "it was undisputed that no weapon was involved . . . ." (*Id.*)

Even if a jury instruction were incorrect under state law, that error would not be a basis for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71B72 (1991); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000).  On habeas review, federal courts ask "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Estelle*, 502 U.S. at 72.  It is not enough that the instruction was "undesirable, erroneous, or even 'universally condemned.'" *Estelle*, 502 U.S. at 72 (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In evaluating the impact of the instruction, courts consider the claim in the context of the instructions and the trial record as a whole.  *Cupp*, 414 U.S. at 147.  The Supreme Court has defined the subcategory of infractions that constitute constitutional violations very narrowly.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

The trial court's failure to read a few words from a standard instruction, words that had no applicability on the record before it, does not rise to the level of a due process violation.  Petitioner's jury instruction challenge has no merit.

### F.     Errors in sentencing

With regard to his sentence, Petitioner argues it is unconstitutional first because the trial court improperly scored three variables yielding a sentence based on inaccurate information; and second, because the trial court violated his Sixth Amendment right to trial by jury when it sentenced him based on facts neither admitted by Petitioner nor proven to a jury beyond a reasonable doubt. Neither argument has merit.

### 1.   False information

A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447;*United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)).  A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence.  *Tucker*, 404 U.S. at 444, 447.

The trial court scored Offense Variable 3 at 5 points because Ms. Bucco had suffered a physical injury, a scratch on her back.  Petitioner believes that a scratch in insufficient.  The trial court scored Offense Variable 4 at 10 points because Ms. Bucco suffered serious psychological injury that either required or might require professional treatment.  Petitioner believes it should be scored at 0 because there was no evidence that Ms. Bucco sought treatment.  The trial court scored Offense Variable 10 at 5 points because Petitioner used his size, strength, and the age difference to exploit Ms. Bucco.  Petitioner believes that only the age difference is factually supportable and argues that age difference alone does not warrant scoring 5 points on this variable.  Each of these arguments is purely an issue of state law and, thus, not cognizable on habeas review except to the extent it reveals constitutionally significant misinformation.

In evaluating Petitioners claims, however, this Court is bound by the Michigan Court of Appeals interpretation of state law.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). The court of appeals rejected each of Petitioner's contentions of error.  (Mich. Ct. of App. Op., ECF No. 19, p. 12.)

That rejection is significant not only with regard to the interpretation and application of Michigan's sentencing guidelines, but also with regard to the underlying facts.  The state court's factual determinations with regard to Ms. Bucco's physical injury, serious psychological injury, and exploitation by virtue of the age difference, are presumed correct.  Petitioner must present clear and convincing evidence to overcome that presumption.  He has not.  Accordingly, Petitioner has failed to establish the foundational element of his due process sentencing claim: he has failed to establish that his sentence is based upon misinformation.

## 2.    Violation of Petitioner's Sixth Amendment right to trial by jury

Petitioner next contends that the trial court increased his minimum sentence by relying on facts that were neither admitted nor proven to a jury beyond a reasonable doubt. Petitioner bases his argument on a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and ending with *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151 (2013).[9]   In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a

---

[9]Although not cited by Petitioner, this line of cases also includes *Ring v. Arizona*, 53 US 584 (2002) and *United States v. Booker*, 543 U.S. 220 (2005).  Petitioner focuses exclusively on  *Blakely v. Washington*, 542 U.S. 296 (2004).

jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence. In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing guideline scheme, under which the maximum penalty could be increased by judicial fact-finding. The *Blakely* Court held that the state guideline scheme violated Sixth Amendment rights, and reiterated the rule that any fact that increased the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt." *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Unlike the State of Washington's determinate sentencing system at issue in *Blakely*, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing Mich. Comp. Laws § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing Mich. Comp. Laws § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). The Michigan Court of Appeals reached the same conclusion when it evaluated Petitioner's claim under *Blakely*. (Mich. Ct. of App. Op., ECF No. 19, p. 12-13.)

Subsequent decisions have refined the analysis. The Supreme Court expanded the *Blakely* reasoning to mandatory minimum sentences in *Alleyne v. United States*, 570 U.S. ___, 133

- 34 -

S. Ct. 2151 (2013).  The Michigan Court of Appeals concluded that *Alleyne* only prohibited judicial factfinding used to determine mandatory minimum sentence, but had no impact on judicial factfinding in scoring the sentencing guidelines producing a minimum range for an indeterminate sentence, the maximum of which is set by law.  *See People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013) *rev'd* 870 N.W.2d 561 (2015).[10]  The Sixth Circuit also concluded that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violated the Sixth Amendment.  *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013).  As a consequence, the Sixth Circuit held, the question is not a matter of clearly established Supreme Court precedent.  *Id.* (citing *Montes v. Trombley*, 599 F.3d 490, 498 (6th Cir. 2010)); *see also Saccoccia v. Farley*, 573 F. App'x 483, 485 6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory *statutory* minimum [are] part of the substantive offense.'. . . It said nothing about guidelines sentencing factors . . . .) (quoting *Alleyne*, 133 S. Ct. at 2161 (emphasis added)).

*Alleyne* does not affect Petitioner's case.  The federal courts have held that *Alleyne* is inapplicable to cases decided prior to its issuance.  *See, e.g., In re Mazzio*, 756 F.3d 487 (6th Cir. 2014) (holding that *Alleyne* did not retroactively apply to challenges to sentence on collateral review); *Brownlee v. Rivard*, No. 13-cv-10197, 2014 WL 2780028, at *5 (E.D. Mich. June 19, 2014); *see also Mingo v. United States*, No. 1:13-cv-787, 2013 WL 4499249, at *2 (W.D. Mich. Aug. 19, 2013) (holding that *Alleyne* may not be applied retroactively to cases that were final before it was decided).

---

[10]*Herron* was reversed following the decision in *People v. Lockridge*, 870 N.W.2d 502 (Mich.   2015). *Lockridge* is discussed in detail below.

Although *Alleyne* does not apply here, it has changed the landscape of guidelines sentencing in Michigan.  In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), in a 5-2 decision, the Michigan Supreme Court considered the question the Michigan Court of Appeals had faced in *Herron* and reached the opposite conclusion.  The *Lockridge* court reasoned that, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range," they increase the "mandatory minimum" sentence under *Alleyne*.  *Lockridge*, 870 N.W.2d at 506.  As a consequence, the *Lockridge* court held that the mandatory application of Michigan's sentencing guidelines was unconstitutional, and the remedy was to make them advisory only. *Id.* at 520-521.

However, *Lockridge*, by its own terms, is inapplicable to Petitioner's sentence.  The Michigan Supreme Court only made its holding in *Lockridge* applicable to cases still "pending on direct review."  *Id.* at 523.  Petitioner's case was not pending on direct review at the time the *Lockridge* court reached its decision.

It is the *Alleyne/Lockridge* analysis that might permit the sort of relief that Petitioner requests here.  Those decisions are simply inapplicable to Petitioner's case.  The clearly established federal law relevant to Petitioner's claims can be found in *Blakely*.[11]  The Michigan Court of Appeals decision rejecting Petitioner's Sixth Amendment sentencing claim is entirely consistent with and a reasonable application of *Blakely*.  Accordingly, Petitioner's claim is without merit.

---

[11]"'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

### G.     Ineffective assistance of trial counsel generally

Petitioner contends that his trial counsel was ineffective for failing to object to the errors he has raised in his habeas petition.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).

The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.

Petitioner contends his trial counsel failed to pose objections or make arguments that Petitioner now raises on habeas review. As set forth above, however, Petitioner's habeas issues either have no merit or caused him no prejudice. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Accordingly, Petitioner has failed to demonstrate that his trial counsel was ineffective under the *Strickland* standard.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this

standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   September 12, 2016                /s/ Paul L. Maloney
                                         Paul L. Maloney
                                         United States District Judge